# United States District Court
# Northern District of Indiana

| | | |
|---|---|---|
| VIRGIL E. GRIFFIN, | ) | |
| | ) | |
| Petitioner, | ) | |
| | ) | |
| v. | ) | Civil Action No. 3:11-CV-462 JVB |
| | ) | |
| SUPERINTENDENT, | ) | |
| | ) | |
| Respondent. | ) | |

## OPINION AND ORDER

Virgil E. Griffin, a *pro se* prisoner, is serving a 65-year sentence for a murder committed in Laporte County. *State v. Griffin*, No. 46D01-0111-CF-126. He filed a petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254. (DE 4.)

**I. BACKGROUND**

In deciding this petition, the court must presume the facts set forth by the state courts are correct. 28 U.S.C. § 2254(e)(1). It is Griffin's burden to rebut this presumption with clear and convincing evidence. *Id*. On direct appeal, the Indiana Court of Appeals set forth the facts underlying Griffin's offense as follows:

> On November 19, 2001, Kyra Simmons and Erika Murray were driving around Michigan City. At approximately 3:30 p.m., they saw Griffin standing on Michigan Boulevard, so they pulled over to see what he was doing. Griffin decided to get into the car with Simmons and Murray. While in the car, Griffin asked Simmons and Murray if they knew Delfanta Gross, and they responded they did. When Simmons and Murray asked why Griffin wanted to know, Griffin stated that he heard Gross had a "beef" with him or that Gross was looking for him.
>
> Simmons, Murray and Griffin drove down Michigan Boulevard and turned onto 10th Street, where they saw Gross talking to two women in another car on the opposite side of the street. When Simmons and Murray told Griffin that the man talking to the occupants of the other car was Gross, Griffin told Murray to pull over near the other car. Griffin then called Gross over to the car Griffin was in and told Gross that Griffin heard Gross was looking for him. Gross responded that he did not know who

> Griffin was, to which Griffin mumbled something. When Gross leaned into the car window and asked "Who?" Griffin shot Gross three or four times at close range. Gross turned and tried to run from the car, but he collapsed in the middle of the street. While Murray started to drive away, Griffin fired additional shots at Gross.
>
> Gross died as a result of multiple gunshot wounds. Griffin was subsequently arrested and charged with murder, a felony.

*Griffin v. State*, No. 46A05-0304-CR-156, slip op at *1-3 (Ind. App. Ct. Sept. 23, 2003). Following a jury trial, Griffin was convicted and sentenced to 65 years in prison. *Id.* at *3.

He appealed, raising the following issues: (1) the trial court erred in allowing the jury to hear evidence pertaining to a prior incident in which he allegedly shot at the victim; and (2) the trial court abused its discretion in imposing a sentence. *Id.* at *2. The Indiana Court of Appeals determined that admission of the evidence about the prior shooting was error, but found such error harmless in light of the other evidence of Griffin's guilt. *Id.* at *4-8. The court found no error in connection with the sentence imposed, and affirmed Griffin's conviction and sentence in all respects. *Id.* at *8-10. The Indiana Supreme denied Griffin's petition to transfer (DE 15-2 at 4), and he did not seek review in the United States Supreme Court. (DE 4 at 1.)

Thereafter, Griffin filed a petition for post-conviction relief claiming ineffective assistance of trial and appellate counsel on various grounds. *Griffin v. State*, No. 46A03-1003-PC-106, slip op at *1 (Ind. Ct. App. Nov. 16, 2011). Following an evidentiary hearing, the trial court denied the petition. *Id.* The Indiana Court of Appeals affirmed. *Id.* at *4. The Indiana Supreme Court denied Griffin's petition to transfer. (DE 15-8 at 7.) Griffin did not seek review in the United States Supreme Court. (DE 4 at 2.)

Griffin then filed this federal habeas petition raising the following claims: (1) his trial counsel was ineffective in failing to investigate allegedly exculpatory witnesses; (2) his trial

counsel was ineffective in failing to object to prejudicial testimony regarding his involvement in an unrelated shooting; (3) his trial counsel was ineffective in failing to investigate alleged juror misconduct; and (4) his appellate counsel was ineffective in failing to submit portions of the trial record in connection with his appeal.[1] (DE 4 at 2.)

## II. ANALYSIS

Griffin's petition is governed by the provisions of the Anti-Terrorism and Effective Death Penalty Act of 1996 ("AEDPA"). *See Lindh v. Murphy*, 521 U.S. 320, 336 (1997). AEDPA allows a district court to issue a writ of habeas corpus on behalf of a person in custody pursuant to a state court judgment "only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2254(a). An application for habeas relief must meet the stringent requirements of 28 U.S.C. § 2254(d), set forth as follows:

> An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim—
> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

Under this deferential standard, a federal habeas court must "attend closely" to the decisions of state courts and "give them full effect when their findings and judgments are consistent with federal law." *Williams v. Taylor*, 529 U.S. 362, 383 (2000). A state court

---

[1] The Court notes that Griffin filed a traverse in support of his petition, and also filed two documents which he labels as motions for "summary judgment" pursuant to FED. R. CIV. P. 56. (DE 13, 18, 19.) Although Griffin has not demonstrated an entitlement to summary judgment, the Court has duly considered the arguments he raises in his motions as supporting his request for habeas relief.

3

decision is "contrary to" federal law if the state court arrives at a conclusion opposite to that reached by the Supreme Court or reaches an opposite result in a case involving facts materially indistinguishable from relevant Supreme Court precedent. *Bell v. Cone*, 535 U.S. 685, 694 (2002). A federal court may grant habeas relief under the "unreasonable application" clause if the state court identifies the correct legal principle from Supreme Court precedent but unreasonably applies that principle to the facts of the petitioner's case. *Wiggins v. Smith,* 539 U.S. 510, 520 (2003). To warrant relief, a state court's decision must be more than incorrect or erroneous; it must be "objectively" unreasonable. *Id.* In other words, "[a] state court's determination that a claim lacks merit precludes federal habeas relief so long as fairminded jurists could disagree on the correctness of the state court's decision." *Harrington v. Richter*, —U.S.—, 131 S. Ct. 770, 786 (2011). Furthermore, "even a strong case for relief does not mean the state court's contrary conclusion was unreasonable." *Id.*

All of Griffin's claims are premised on alleged ineffective assistance of counsel. To prevail on a claim of ineffective assistance of counsel, the petitioner must show that counsel's performance was deficient and that the deficient performance prejudiced him. *Strickland v. Washington*, 466 U.S. 668 (1984). On the deficiency prong, the central question is "whether an attorney's representation amounted to incompetence under prevailing professional norms, not whether it deviated from best practices[.]" *Richter*, 131 S. Ct. at 788. The court's review of counsel's performance is deferential, and there is an added layer of deference when the claim is raised in a habeas proceeding; the petitioner "must overcome the presumption that, under the circumstances, the challenged action might be considered sound trial strategy." *Davis v. Lambert*, 388 F.3d 1052, 1059 (7th Cir. 2004). The court will also "evaluate [counsel's]

4

performance as a whole rather than focus on a single failing or oversight." *Ebert v. Gaetz*, 610 F.3d 404, 412 (7th Cir. 2010). Furthermore, the court must "respect [its] limited role in determining whether there was manifest deficiency in light of information then available to counsel." *Premo v. Moore*, —U.S.—, 131 S. Ct. 733, 741 (2011).

On the prejudice prong, the petitioner must show there is a reasonable probability that "but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694. A reasonable probability is one "sufficient to undermine confidence in the outcome." *Id*. at 693. In assessing prejudice under *Strickland*, "the question is not whether a court can be certain counsel's performance had no effect on the outcome or whether it is possible a reasonable doubt might have been established if counsel had acted differently." *Richter*, 131 S. Ct. at 791. Rather, "[t]he likelihood of a different result must be substantial, not just conceivable." *Id.* at 792. Where it is expedient to do so, the court may resolve an ineffective assistance claim solely on the prejudice prong, because if the petitioner cannot establish prejudice, there is no need to "grade" counsel's performance. *Strickland*, 466 U.S. at 697.

A claim of ineffective assistance of appellate counsel is also subject to the *Strickland* analysis. *Howard v. Gramley*, 225 F.3d 784, 789-90 (7th Cir. 2000). On the deficiency prong, the petitioner must show that counsel failed to present a "significant and obvious" issue on appeal. *Id.* at 790. However, counsel "need not (and should not) raise every nonfrivolous claim, but rather may select from among them in order to maximize the likelihood of success on appeal." *Smith v. Robbins*, 528 U.S. 259, 288 (2000). On the prejudice prong, the petitioner must demonstrate that if the argument had been raised, there is "a reasonable probability that his case would have been remanded for a new trial or that the decision of the state trial court would have

5

been otherwise modified on appeal." *Howard*, 225 F.3d at 790. Where the underlying argument has no merit, an ineffective assistance claim cannot succeed, because "[f]ailure to raise a losing argument, whether at trial or on appeal, does not constitute ineffective assistance of counsel." *Stone v. Farley*, 86 F.3d 712, 717 (7th Cir. 1996).

### A. Failure to Investigate

Griffin's first claim is that his trial counsel was ineffective in failing to investigate alleged exculpatory witnesses. (DE 4 at 3.) In rejecting this claim, the Indiana Court of Appeals properly identified *Strickland* as the governing standard, and determined that counsel was not deficient *See Griffin*, No. 46A03-1003-PC-106, slip op. at *2. Based on the record, this was not an unreasonable application of *Strickland*.

Under the Sixth Amendment, counsel has "a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary." *Strickland*, 466 U.S at 690-91. The decision whether to investigate must be assessed for reasonableness based on the circumstances, "applying a heavy measure of deference to counsel's judgments." *Id.* at 691. To establish prejudice in connection with counsel's failure to investigate, the petitioner must make a "comprehensive showing" of what further investigation would have revealed. *United States v. Zillges*, 978 F.2d 369, 373 (7th Cir. 1992).

Here, the record shows that in the initial stages of the investigation police spoke with a 14-year old girl named Tasia Oliver who claimed to have witnessed the shooting. (*See* PCR Appx. at 25-41.) When police interviewed her, she gave several conflicting accounts of what occurred, including one that implicated Griffin. (*Id.* at 34-37.) At one point she maintained that she saw "L" and his brother, later identified as Elliott and Sam Newsome, riding in the back of

6

Simmons' car, and that "L" committed the shooting. (*Id.* at 27.) Police located and interviewed Elliott Newsome and determined that he was not involved, and later verified that Sam Newsome was at work at the time of the offense. (*Id.* at 28-31.)

At the post-conviction hearing, Griffin's counsel, who had approximately 20 years of experience at the time of the trial, testified that his trial strategy was based on Griffin's admission to him during their pretrial discussions that he had in fact murdered Gross.[2] (PCR Tr. at 17, 21-22.) Counsel was also aware of a witness at the jail who claimed Griffin had been bragging about committing the murder, and had even made up a rap song which counsel described as "glorifying how you killed this guy in cold blood." (*Id.* at 18.) Based on this, counsel did not consider calling any alibi witnesses or witnesses who would testify that someone else committed the shooting, which he considered to be a violation of his ethical obligations. (PCR Tr. at 17-21.) Counsel specifically recalled Griffin offering to "have some people lie and fabricate [a] story" about him being somewhere else when the shooting occurred, but counsel told him he could not do that. (*Id.* at 22.)

Griffin nevertheless wishes counsel had done more to investigate other potential suspects, including Elliott Newsome. However, such information was of limited use to counsel, since he could not present false testimony that someone other than Griffin shot Gross. *See* IND. CODE OF PROF. RESP. DR 7-102(A)(4). Counsel briefly considered arguing self-defense, but decided against this strategy after it was determined that the victim was unarmed. (PCR Tr. at 23-24.) He

---

[2] Griffin submitted a sworn affidavit in the post-conviction proceedings admitting that he told counsel he shot Gross; he claimed that he did so because he did not want to be viewed as a "snitch" among the other inmates at the jail. (PCR Ex. 2, Griffin Aff. ¶ 10.)

also wanted to avoid having Griffin testify, which would have been necessary if he asserted self-defense. (*Id.* at 24.)

Faced with limited options, counsel opted for a strategy of trying to create reasonable doubt by attacking the state's witnesses and evidence. (PCR Tr. at 12-13, 15.) In furtherance of this strategy he met with Griffin, reviewed police records, and deposed several of the state's witnesses. (*Id.*) Based on the pretrial investigation he conducted, counsel was able to effectively cross-examine the state's primary eyewitness, Simmons, eliciting testimony from her that she initially lied to police about the identity of the shooter, that she had been drinking heavily prior to the shooting, and that she and Murray had been driving around looking to buy marijuana when they first saw Gross. (*See* Trial Tr. at 91-113.) He also effectively cross-examined the state's other witnesses, eliciting testimony that they did not see who was in the back of Simmons' car, or that they did not know whether Gross had been acting aggressively just prior to the shooting. (*Id.* at 26-35, 42-51, 125-37, 146-52.) Counsel elicited testimony that this was a high crime area, and that there were other people congregating on the street, including at least one person with a criminal record. (*Id.* at 133, 160-61.) He vigorously cross-examined the state's ballistic expert and the medical examiner, casting doubt on their conclusions and providing a basis for the jury to conclude that someone else in the car, or one of the other people on the street that day, had shot Gross. (*Id.* at 210-22, 224-25, 236-44.) Additionally, although counsel could not ethically present false testimony that someone else committed the offense, he was able to inform the jury through the testimony of a police officer that other potential suspects had been linked to the shooting. (Trial Tr. at 308-11.) In short, Griffin has not established that counsel was deficient.

8

Griffin has also failed to establish a reasonable probability that if counsel had pursued an investigation of Newsome, the result of the proceeding would have been different. As recounted above, there is significant evidence of Griffin's guilt in the record. Simmons testified that she saw Griffin shoot Gross multiple times at point-blank range, and another witness testified that he saw Griffin shortly after the shooting and Griffin told him, "I think I may have killed somebody." (Tr. at 286.) Griffin fled the state after the murder, and was later found by police in his grandmother's home in Chicago hiding in a closet in the basement. (Trial Tr. at 249-50.) Griffin also admitted to counsel at the time of trial that he committed the murder. (PCR Tr. at 17, 21-22; PCR Ex. 2, Griffin Aff. ¶ 10.)

In contrast, Griffin offers only speculation about what an investigation of Newsome might have revealed, and the police's own investigation led to a determination that he was not involved in the shooting. Griffin places great weight on Tasia Oliver's account to police, but the information she provided was at best confused and conflicting. (PCR Appx. at 28-37.) At one point she told police L and his brother were the occupants of Simmons' car, but in another version she said it was L and Griffin. (*Id.* at 37.) When the officers tried to pin down the holes in her account, she became uncooperative and refused to answer any more questions. (*Id.*) Police later discredited her account that she saw Elliott and Sam Newsome in the car, because Sam Newsome was at work at the time of the offense. (*Id.* at 28, 34-35, 78.) One police officer involved in the investigation ultimately concluded that Oliver had not seen anything; he surmised that she had been present at the hospital where Gross was taken, had "heard everyone's theories and made up the story line" that L, who was in town visiting from Chicago, shot Gross. (PCR Appx. at 82.)

In light of these facts, the court cannot conclude that Griffin's counsel was deficient in failing to investigate exculpatory witnesses, or that Griffin suffered any prejudice as a result. The state court's rejection of this claim was not unreasonable, and accordingly, this claim is denied.

**B.     Failure to Object**

Griffin's next claim is that his trial counsel was ineffective in failing to object to testimony regarding his involvement in the unrelated shooting of Brian Rhodes, known as "Fresh." (DE 4 at 3.) The Indiana Court of Appeals rejected this claim on post-conviction review. *Griffin*, No. 46A03-1003-PC-106, slip op. at *3. Based on the record, this was not an unreasonable application of *Strickland*.

During the defense case-in-chief, Griffin's counsel called Detective Chris Yagelski as a witness. (Trial Tr. at 302-27.) Counsel questioned him about false statements Simmons initially made to police, in which she identified the shooter as someone named "Chris." (*Id.* at 302-10.) In the course of this questioning, Detective Yagelski testified that Simmons later identified the shooter, who she knew only as "Mack," as the "gentleman that shot Fresh" a few years earlier. (Trial Tr. at 310.) Counsel ignored the detective's statement about the shooting, which was not directly responsive to his question, and continued with his inquiry. (*Id.*) During cross-examination, the prosecutor asked the detective about Simmons' identification of Griffin, which elicited more testimony about the shooting of Fresh. Specifically, the following colloquy occurred:

Q:     And [the officers] told [Simmons], "We think you're lying . . . Be truthful."

A:     Correct.

Q:     Come clean. . . . and she said okay. It's Mack. I know him as Mack.

> A: Correct.
>
> Q: Is that correct?
>
> A: Well, she went a little further than that, but yeah she identified him as Mack.
>
> Q: And how did she go further?
>
> A: She identified that the same person that shot Fresh.
>
> Q: Okay. Now, did you know who Fresh is?
>
> A: I didn't at that time, personally.
>
> Q: Okay. Another member of the Investigations Bureau knew of an incident where a Fresh was shot.
>
> A: Yes.
>
> Q: Who was that?
>
> A: Would be Detective Litchford and Detective Westphal, who was the lead investigator in that case.
>
> Q: And following that, what, in the investigative efforts of this case to identify the offender, was done?
>
> A: They talked to Detective Westphal who was the lead investigator, and they also pulled the original case involving Fresh who we knew as Brian Rhodes; and in pulling that case had found that Virgil Griffin was involved and also went by the nickname Mack at that time, which was an incident that occurred in 1999.
>
> Q: Did you then take the photograph from that case involving the shooting of Fresh, and put it in a line-up?
>
> A: Yes we did.

(Trial Tr. at 323-24.) Thereafter, the prosecutor questioned the detective about Simmons' identification of Griffin from the line-up, and there were no further references to Fresh. (*Id.* at 325-26.)

11

Griffin argues that his counsel was ineffective in failing to object to this testimony under Indiana Rule of Evidence 404(B), which prohibits prior bad acts evidence. (DE 4 at 3.) In rejecting this claim on post-conviction review, the Indiana Court of Appeals determined that an objection by counsel would not have been sustained under Indiana law, because Griffin's counsel had "opened the door" to this line of questioning during his direct examination of Detective Yagelski. *Griffin*, No. 46A03-1003-PC-106, slip op. at *3. As Griffin points out, Indiana law generally considers the "door" to be opened to Rule 404(B) evidence only where defense counsel's questions left the trier of fact "with a false or misleading impression of the facts." *Clark v. State*, 915 N.E.2d 126, 130 (Ind. 2009). That is not what occurred here, since defense counsel simply ignored the detective's testimony about the shooting, which was not directly responsive to his questions. (*See* Trial Tr. at 310.)

Nevertheless, this court is bound by the state court's determination of state evidentiary law in deciding whether counsel was ineffective in failing to object to this testimony. *See Huusko v. Jenkins,* 556 F.3d 633, 637 (7th Cir. 2009) ("[A] federal court cannot issue a writ of habeas corpus that rests on a belief that a state court has misunderstood or misapplied state law."); *Earls v. McCaughtry*, 379 F.3d 489, 495 (7th Cir. 2004) (federal habeas court was bound by state court's determination that evidence at issue was admissible under state law in assessing ineffective assistance claim premised on failure to object). Because the state court determined that an objection would have been unavailing under state law, counsel cannot be considered ineffective in failing to object. *See Stone*, 86 F.3d at 717.

Even if the state court's determination of the state law issue is erroneous, as Griffin argues, he still must overcome the presumption that counsel did not object to this testimony for

12

legitimate strategic reasons. *Strickland*, 466 U.S. at 690 (court considering ineffective assistance claim must presume counsel "rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment"). Although Griffin's counsel had no specific recollection of this testimony seven years after the trial, he espoused a general philosophy of making limited objections. (PCR Tr. at 50-57, 66.) The testimony pertaining Fresh was brief, spanning a little over a page in a 340-page trial transcript. (Trial Tr. at 324-25.) The testimony was also somewhat confusing, and there was never any indication to the jury that Griffin was ever charged or convicted of shooting Fresh. (Trial Tr. at 310, 324-25.)

Under these circumstances, counsel could have reasonably concluded that objecting to this testimony would have called unnecessary attention to it. *See Hough v. Anderson*, 272 F.3d 878, 896 (7th Cir. 2001) (habeas petitioner failed to establish ineffective assistance based on counsel's failure to object to prior bad acts evidence where counsel might have been trying to avoid "appearing so protective of [the defendant] as to arouse the suspicion of the jury"); *see also Humbles v. Buss*, 268 Fed. Appx. 459, 464 (7th Cir. Feb. 12, 2008) (habeas petitioner failed to overcome presumption that counsel made a strategic decision not to object in order to avoid calling attention to police officer's improper testimony referring to the petitioner's photo as a "mug shot"). The question is not whether an objection would have been the best course of action, but whether counsel's performance fell below an objective standard of reasonableness. *Richter*, 131 S. Ct. at 788. Griffin has not satisfied that standard.

Griffin also has not demonstrated prejudice. As recounted above, there was significant evidence of Griffin's guilt before the jury, including eyewitness testimony that he shot the victim at point-blank range, and evidence of incriminating statements he made immediately after the

13

shooting. In assessing prejudice under *Strickland*, "the question is not whether a court can be certain counsel's performance had no effect on the outcome or whether it is possible a reasonable doubt might have been established if counsel had acted differently." *Richter*, 131 S. Ct. at 791. "The likelihood of a different result must be substantial, not just conceivable." *Id.* at 792. Based on the evidence, Griffin has not shown that the result of the trial would have been different had counsel objected to this testimony. The state court's rejection of this claim was not unreasonable, and accordingly, this claim is denied.

## C. Failure to Address Juror Misconduct

Griffin's next claim is that his trial counsel was ineffective in failing to investigate alleged juror misconduct. (DE 4 at 4.) The Indiana Court of Appeals rejected this claim on post-conviction review. *Griffin*, No. 46A03-1003-PC-106, slip op. at *3. Based on the record, this was not an unreasonable application of *Strickland*.

At the post-conviction hearing, Griffin called his aunt Yolanda Griffin as a witness, who testified in general terms that she saw a juror talking to one of the victim's family members "outside the court building" during his trial. (PCR Tr. at 68.) For unknown reasons, Griffin did not elicit any testimony from his aunt regarding which juror was involved, which family member of the victim was involved, how long the conversation lasted, whether she overheard what was said, or at what point in the trial it allegedly occurred. (*See id.*) Ms. Griffin did claim that she told Griffin's counsel about this incident at trial; however, counsel testified that he had no recollection of anyone telling him about such an incident occurring, and the post-conviction court credited his testimony. *Griffin*, No. 46A03-1003-PC-106, slip op. at *3. As the Indiana

14

Court of Appeals concluded, counsel cannot be considered ineffective in failing to pursue an issue that was not brought to his attention. *See Premo*, 131 S. Ct. at 741.

Furthermore, Griffin has not made the necessary showing of prejudice, given the lack of any specifics about what occurred. *See Wisehart v. Davis*, 408 F.3d 321, 326 (7th Cir. 2005) (to warrant some type of inquiry, extraneous communication with juror must be "of a character that creates a reasonable suspicion" that the defendant was deprived of a fair trial); *see also Whitehead v. Cowan*, 263 F.3d 708, 722 (7th Cir. 2001) ("[T]he mere fact that the jury was exposed to something which could theoretically affect its vote is not sufficient to require a new trial."). While it would have been improper for a family member of the victim to try to influence the jury's deliberations, *see Remmer v. United States*, 347 U.S. 227, 229 (1954), there is no indication that is what occurred here. For all that is revealed in the record, the two could have simply exchanged brief words like "excuse me" or "good night" on the way out of the courthouse, or they could have engaged in a conversation after the verdict was reached but before Griffin was sentenced. *See Wisehart*, 408 F.3d at 326 (observing that it is "so easy to imagine situations" in which a private communication with a juror would not warrant any type of inquiry). The court must also bear in mind that the information about this incident came from Griffin's family member several years after his trial. *See House v. Bell*, 547 U.S. 518, 552 (2006) (observing that "eleventh hour" testimony from a family member of the accused is significantly less probative than testimony from a witness with "no evident motive to lie"). Based on the record, the state court's rejection of this claim was not unreasonable and, accordingly, the claim is denied.

### D. Appellate Counsel's Failure to Obtain Transcript

Griffin's final claim is that his appellate counsel was ineffective in failing to submit portions of the trial record on direct appeal. (DE 4 at 4.) The Indiana Court of Appeals rejected this claim on post-conviction review. *Griffin*, No. 46A03-1003-PC-106, slip op. at *3. Based on the record, this was not an unreasonable application of *Strickland*.

On direct appeal, one of Griffin's claims was that the trial court erred in admitting evidence pertaining to a prior altercation between Griffin and the victim.[3] *Griffin*, No. 46A05-0304-CR-156, slip op. at *4. Griffin's trial counsel sought to keep this evidence out of the record on Rule 404(B) grounds, but was overruled. *Id.* The state argued, and the trial court agreed, that the evidence was relevant to show motive. *Id.* On appeal, counsel argued that admission of this evidence was error. *Id.* He requested that the trial transcript be made part of the record on appeal, but for unknown reasons the court reporter did not prepare a transcript of jury instructions or closing arguments. (*See* Trial Tr. at 340.) Counsel apparently did not make further efforts to obtain these portions of the record. Upon considering the merits, the Indiana Court of Appeals agreed that the evidence should have been excluded. Nevertheless, the court found such error harmless in light of the "substantial" evidence of Griffin's guilt. *Griffin*, No. 46A05-0304-CR-156, slip op. at *7-8.

In the post-conviction proceedings, Griffin argued that his appellate counsel was deficient in failing to submit a transcript of closing arguments on direct appeal. *Griffin*, No.

---

[3] The Indiana Court of Appeals summarized the facts surrounding the prior incident as follows: "At trial, the State presented evidence that approximately one week before the murder Gross was walking home on 8th Street one evening when Griffin shouted at him from across the street, asking Gross to identify himself. Gross did not respond, but continued walking. Griffin then yelled, 'Well, since you won't tell me who you is,' and shot at Gross several times. Gross ran away and stopped at his aunt's house on 10th Street to call his brother." *Griffin*, No. 46A05-0304-CR-156, slip op. at *3. Two of the witnesses could only recount what Gross told them about the incident, and he apparently did not know who shot at him. *Id.* at *6. The third witness believed it was Griffin who shot at Gross, but she acknowledged that she did not actually see him fire a gun. *Id.*

46A03-1003-PC-106, slip op. at *4. The Indiana Court of Appeals rejected this claim, concluding that although Griffin's counsel "could have exercised more diligence in the preparation of the Record on Appeal," his failure to obtain this portion of the transcript did not affect the outcome of the appeal. *Id.* As the court pointed out, Griffin did not raise a claim pertaining to closing arguments. Rather, his claim was that the trial court erred in admitting the testimony pertaining to his prior altercation with the victim. *Id.* Appellate counsel presented the appellate court with the relevant portions of the trial transcript, and the court agreed that the evidence was not relevant. Under these circumstances, Griffin has not established that counsel was deficient.

Nor has he demonstrated that the result of the appeal would have been different had counsel submitted a transcript of closing arguments. The Indiana Court of Appeals specifically concluded on post-conviction review that the absence of the closing argument transcripts did not affect the resolution of Griffin's direct appeal. *Id.* Thus, Griffin cannot make the necessary showing of prejudice. *See Stone*, 86 F.3d at 717 (counsel on direct appeal could not be considered deficient in failing to raise an argument that the state court considered and rejected on post-conviction review). Based on the record, the state court's rejection of this claim was not unreasonable and, accordingly, the claim is denied.

### E. Certificate of Appealability

As a final matter, the court must consider whether to grant Griffin a certificate of appealability. 28 U.S.C. § 2253(c); Rule 11 of the Rules Governing Section 2254 Cases. To obtain a certificate of appealability, the petitioner must make a substantial showing of the denial of a constitutional right by establishing "that reasonable jurists could debate whether (or, for that

17

matter, agree that) the petition should have been resolved in a different manner or that the issues presented were adequate to deserve encouragement to proceed further." *Slack v. McDaniel*, 529 U.S. 473, 484 (2000). For the reasons fully explained above, Griffin has not made a substantial showing of the denial of a constitutional right, nor is there a basis to conclude that jurists of reason would debate the outcome of the petition or find a reason to encourage Griffin to proceed further. Accordingly, the court declines to issue Griffin a certificate of appealability.

### III. CONCLUSION

For the reasons set forth above, the court **DENIES** the petition (DE 4), and **DENIES** the petitioner a certificate of appealability.

**SO ORDERED** on June 26, 2012.

 s/ Joseph S. Van Bokkelen  
Joseph S. Van Bokkelen  
United States District Judge  
Hammond Division